# Exhibit 3

RETURN DATE: AUGUST 25, 2026

| | | |
|---|---|---|
| SAIFULLAH KHAN,<br>*Plaintiff*,<br><br>v.<br><br>NICHOLAS J. UCCELLO,<br>and SIX UNKNOWN NAMED AGENTS OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (DOES 1–6),<br>each in an individual capacity,<br>*Defendants*. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | SUPERIOR COURT<br>JUDICIAL DISTRICT OF<br><br>HARTFORD<br><br>AT HARTFORD<br>JULY 10, 2026 |

## COMPLAINT

### FIRST COUNT (Deprivation of Rights Secured by the Fourth Amendment — Excessive Force — P.A. 26-14, § 1 — Against All Defendants)

1. On Friday, May 9, 2025, at approximately 2:40 in the afternoon, inside the Abraham A. Ribicoff Federal Building and United States Courthouse at 450 Main Street in Hartford, officers of U.S. Immigration and Customs Enforcement ("ICE"), dressed in plain clothes, fired Tasers into the back of the plaintiff, Saifullah Khan — seven discharges in all — as he ran toward the courtroom he had left moments before, calling out for the judge. No judge had authorized any of it: the only warrant behind the operation was an administrative form ICE had issued to itself.

2. This action arises under Section 1 of Substitute Senate Bill No. 397, Public Act No. 26-14 ("the Act"), which makes every person — including a federal officer or employee — who, under color of law, deprives any person within the jurisdiction of this state of rights secured by the United States Constitution liable to the party injured, and which authorizes punitive damages and attorney's fees. P.A. 26-14, § 1(a)-(b).

3. The plaintiff, Saifullah Khan, is a citizen of Afghanistan and a resident of New Haven, Connecticut, where he has lived at the same address for seven years. He was born in a refugee camp in Pakistan after his family fled the Taliban. He first came to the United States in 2011, as a

scholarship student at the Hotchkiss School, and was admitted in January 2015 as an F-1 student to attend Yale University where he began school in 2012. He is married to a United States citizen. His asylum application, filed June 29, 2016, has since been granted; his application for adjustment of status to lawful permanent residence (Form I-485) is pending; and no removal proceedings are pending against him. He has no criminal record: a Connecticut jury acquitted him in 2018 of the only charges ever brought against him, and the arrest record prepared on May 9, 2025 concedes both that "KHAN was acquitted of those charges" and that "Subject has no criminal history."

4. The defendant Nicholas J. Uccello (ICE Officer No. 8197) was at all relevant times a deportation officer of ICE, Enforcement and Removal Operations, assigned to Hartford, Connecticut, acting under color of the statutes, regulations, customs and usages of the United States. He is sued in his individual capacity.

5. The defendants sued as Six Unknown Named Agents of U.S. Immigration and Customs Enforcement (Does 1 through 6) are officers, employees, or agents of ICE or of other federal components who planned, participated in, directed, ratified, or failed to prevent the conduct described below — among them, on information and belief, one or more agents who discharged Tasers into the plaintiff, and the officers who held and shackled him afterward — and whose identities are not presently known to the plaintiff. Each is sued in an individual capacity. The plaintiff will amend to state their true names when discovery reveals them.

6. Four other ICE officers are named in the arrest record of May 9, 2025: S. Palumbo (Officer No. 8526), Christopher Jones (Officer No. 7276), George Lewis, a deportation officer and tactical medic, and Derek R. Moore (No. D06020), a supervisory detention and deportation officer. This complaint describes their acts where the record supplies them. They are identified as actors, not sued as defendants, and the Doe defendants are persons other than these four officers.

7. The acts and omissions described in this complaint occurred in Hartford, Connecticut. Venue lies in this judicial district.

8. For nearly nine years, the government did not adjudicate the plaintiff's asylum application, and it never once sought to detain him. It knew where he was the entire time: he updated his address with the immigration authorities on the government's own form; the government mailed his work permits and official notices to his home; and it repeatedly granted him employment authorization. He appeared, voluntarily, at every court date in every proceeding that concerned him, for nine years.

9. On March 21, 2025, the plaintiff sued the Secretary of Homeland Security in the United States District Court for the District of Connecticut to compel a decision on that long-pending asylum application. *Khan v. Noem*, No. 3:25-cv-471 (D. Conn.). Thirteen days later, on April 3, 2025, U.S. Citizenship and Immigration Services closed his asylum case and issued a Notice to Appear, placing him in removal proceedings. The relief the plaintiff had asked a federal court to order was a decision on his application; what the agency delivered instead, thirteen days after he asked, was a prosecution. It did not adjudicate the application — it closed it. On information and belief, it did so because he had sued.

10. The Notice to Appear charges no crime. It alleges no fraud, no danger to any person, no misconduct of any kind. Its sole factual charge is this: "You did not attend Yale University from November 13, 2015 to present." On that basis it asserts that the plaintiff "failed to maintain or comply with the conditions" of his student status — a civil charge, resting on a lapse in student status that began in 2015, a decade before the arrest, when Yale suspended him over an accusation of which a Connecticut jury acquitted him. Within months of that lapse, on June 29, 2016, he filed the asylum application whose adjudication he would then await for nine years — the same application the United States has now granted.

11. On April 30, 2025, the plaintiff's wife, a United States citizen, filed a Form I-130 petition on his behalf. On May 8, 2025, the plaintiff applied for Temporary Protected Status as a national of Afghanistan. Both applications were pending on May 9, 2025.

12. On May 9, 2025, the plaintiff appeared, as directed, for a scheduled hearing before Immigration Judge Ted Doolittle on the sixth floor of the Ribicoff Federal Building. Every person entering that building passes through federal security screening, including magnetometers. After the hearing, the judge continued the matter to a future date, and the plaintiff walked out of the courtroom toward the elevators.

13. The arrest team was waiting for him. On May 5, 2025, ICE's Homeland Security Investigations office in New Haven had referred the plaintiff's case to ICE Enforcement and Removal Operations in Hartford. On May 9, the team knew the plaintiff was in the building for his hearing and waited for it to finish. They wore plain clothes. They displayed no badge, no uniform, and no visible insignia of office, and at no point did they identify themselves to the plaintiff as officers.

14. No judge had issued, or was ever asked to issue, a warrant for the plaintiff. The only process supporting the operation, on information and belief, was a Form I-200 Warrant for Arrest of Alien — an administrative form that federal regulations permit ICE officers to sign for themselves, and that was signed here by an ICE officer, not by any judge or neutral magistrate. ICE's own Hartford office sits in the same federal building as the immigration court. On information and belief, the warrant was signed in ICE's own office and carried — an elevator ride of a single floor — to the sixth-floor foyer where the team waited to execute it.

15. An I-200 is not process to punish, and it charges no crime. It issues under 8 U.S.C. § 1226(a), which permits an arrest only so that an alien may be "detained pending a decision on whether the alien is to be removed from the United States." The only two purposes such civil

custody may lawfully serve are securing the alien's appearance at immigration proceedings and protecting the community from danger.

16. No neutral magistrate ever reviewed or authorized this seizure.

17. When the plaintiff walked out of the courtroom into the sixth-floor elevator foyer, more than half a dozen people in plain clothes suddenly turned toward him and closed on him, and defendant Uccello reached for him. Nothing about these men identified them as officers of anything: no badge, no uniform, no insignia, no announcement of any kind before they lunged. The men did not identify themselves — not then, and not at any point before the plaintiff was on the ground.

18. The plaintiff was afraid. He turned and ran back toward the only safety he knew in that building — the courtroom he had just left, where the immigration judge and armed court security officers were — calling out for the judge as he ran. He ran away from the men who grabbed at him, and toward the immigration judge; he ran at no one. As he ran, the men yelled at him to stop. They did not say police. They did not say ICE, immigration, or officers. A yell to stop, from unidentified strangers, told the plaintiff nothing about who they were, and no identification ever followed — only the Tasers. Federal regulation required these agents to identify themselves as immigration officers as soon as practical and safe, 8 C.F.R. § 287.8(c)(2)(iii). They did not do so at any point.

19. Defendant Uccello fired into the plaintiff's back. The strikes did not come one measured trigger-pull at a time: the seven discharges came at roughly the same moment — a volley into the back of one unarmed man, from, on information and belief, more than one weapon. Darts struck his suit jacket, his belt, and his back. In all, the agents discharged Tasers into the plaintiff seven times.

20. No warning that force would be used preceded any of the seven discharges. Before firing, no agent displayed credentials in a manner a frightened, fleeing man could perceive; none

attempted to restrain him by hand; none enlisted the uniformed court security personnel already present in a secured federal building; and none simply followed him into the occupied courtroom — staffed by an immigration judge and court security officers — into which he was loudly announcing his own arrival. He was unarmed. He had cleared federal security screening to enter the building.

21. The plaintiff fell backward as his muscles seized, struck his head, and lost consciousness. The agents handcuffed his hands behind his back; Officer Lewis pulled the Taser probes out of his body on the scene.

22. Defendant Uccello lunged first, fired into the plaintiff's back, and prepared the government's arrest record of the incident. Seven near-simultaneous discharges means, on information and belief, more than one weapon and more than one shooter — the Doe defendants among them. Officers Uccello and Palumbo seized and handcuffed the plaintiff; Officer Lewis removed the probes; Officer Moore, the supervisory officer present, directed the operation. Every agent present had four days of planning and an afternoon of lying in wait in which to object to an operation built on concealment and force — and none gave a warning, none objected, and none intervened.

23. When the plaintiff regained consciousness, Immigration Judge Doolittle had come out of his courtroom and was demanding to know why the officers were doing this. The agents told the judge to stay back and not to interfere with a lawful arrest. Officers afterward described the judge to the plaintiff as a "traitor" for challenging them.

24. The agents took the plaintiff downstairs, in the same building, to a holding cell roughly eight feet by four, and shackled him. He asked to use a bathroom; the request was denied; and he wet himself in the cell. His right side was numb from the electricity and his heart was racing. Emergency medical services took him to Hartford Hospital, where he was evaluated and held until

approximately 10:15 that night — and he was then returned to the same cell and left to sleep on its urine-soaked floor.

25. ICE moved the plaintiff out of Connecticut — first to a facility in Plymouth, Massachusetts, and then to the Moshannon Valley ICE Processing Center in Philipsburg, Pennsylvania, hundreds of miles from his home, his wife, and his counsel. On May 27, 2025, a United States immigration judge ordered him released on a $7,500 bond. He was released on the evening of May 30, 2025, and returned home to New Haven. In all, ICE held him for three weeks.

26. The United States has since granted the plaintiff asylum.

27. The plaintiff suffered puncture wounds and burns at the probe sites, head trauma, cardiac symptoms requiring emergency evaluation, lasting physical pain, and profound humiliation. He suffers severe and continuing emotional harm: his treating psychologist, who began treating him on September 5, 2023 and resumed treatment in July 2025, has diagnosed post-traumatic stress disorder (DSM-5-TR, F43.1). He has incurred and will incur expenses of medical and psychological care and other economic losses.

28. On January 8, 2026, the plaintiff requested ICE's records of the incident under the Freedom of Information Act, including any use-of-force review and any video. ICE has produced nothing.

29. At all relevant times, each defendant acted under color of the statutes, regulations, customs and usages of the United States within the meaning of Section 1(a) of the Act, and subjected the plaintiff, a person within the jurisdiction of this state, to the deprivation of rights secured by the United States Constitution, or caused him to be so subjected.

30. The force was unreasonable by every measure. The severity of the offense: there was no offense — the charge was civil, and ten years old. The threat: none — an unarmed man who had cleared federal security screening, running away from the officers and toward an occupied

courtroom, announcing himself to the immigration judge. Resistance: none — flight from unidentified men grabbing at him is not resistance, and the plaintiff never struck or threatened anyone. Against all that, the defendants fired seven Taser discharges into his back, without a word of warning — not a graduated response that began with the minimum and escalated only as needed, but a single overwhelming volley, seven discharges at roughly the same moment.

31. The absence of judicial process aggravated, rather than excused, the violence. Acting with no judge's warrant, on no criminal charge, and on the strength of a form their own agency signed for itself, the defendants owed the plaintiff more restraint, not less — and they had alternatives short of force available, and used none. ICE's own regulations command the same restraint: a deportation officer "shall always use the minimum non-deadly force necessary to accomplish the officer's mission," escalating only as the subject's actions warrant, 8 C.F.R. § 287.8(a)(1)(iii), and must, as soon as practical and safe, "[i]dentify himself or herself as an immigration officer" at the time of arrest, 8 C.F.R. § 287.8(c)(2)(iii). The defendants did neither. Seven discharges fired at once is not the minimum force the regulation requires; it is the maximum force available, used first.

32. No reasonable officer could have believed that firing a volley of seven Taser discharges into the back of an unarmed, fleeing civil respondent inside a secured federal courthouse was lawful. The seizure and the force were objectively unreasonable, in violation of the Fourth Amendment.

33. The defendants' conduct was willful, wanton, and malicious, or undertaken in reckless disregard of the plaintiff's rights, warranting punitive damages under Section 1(b) of the Act.

34. As a direct and proximate result, the plaintiff suffered the physical injuries, emotional harm, and economic losses described above, in violation of Section 1 of the Act and the Fourth Amendment.

**SECOND COUNT (Deprivation of Rights Secured by the Fourth Amendment — Unreasonable Seizure: Administrative Warrant Executed Against Its Only Lawful Purpose — P.A. 26-14, § 1 — Against All Defendants)**

1.–29. Paragraphs 1 through 29 of the First Count are hereby repeated and incorporated as Paragraphs 1 through 29 of the Second Count.

30. An I-200's only lawful office is to secure a person's appearance at immigration proceedings and to protect the community from danger — and the manner in which the defendants executed theirs served neither end.

31. Danger was refuted by facts the defendants knew before they fired and themselves recorded afterward in their own arrest record — "Subject has no criminal history"; "KHAN was acquitted of those charges" — and the sole charge against the plaintiff was a decade-old civil lapse in student status.

32. That leaves appearance — and the defendants seized the plaintiff at his own appearance. They waited outside the courtroom where he was voluntarily attending the very proceedings an I-200 exists to secure, in the ninth year of his voluntary appearances. A warrant whose only office is to ensure that a man shows up for court cannot reasonably be executed, with violence, on the man as he shows up for court.

33. A seizure that serves none of the purposes that could lawfully support it — executed on no judicial process, by unidentified men, with the force described above, against a man whose address and cooperation the government had documented for nine years — is an unreasonable seizure in violation of the Fourth Amendment, facially at odds with the only justifications the law recognizes for such an arrest.

34. The defendants' conduct was willful, wanton, and malicious, or undertaken in reckless disregard of the plaintiff's rights, warranting punitive damages under Section 1(b) of the Act.

35. As a direct and proximate result, the plaintiff suffered the injuries described above, in violation of Section 1 of the Act and the Fourth Amendment.

**THIRD COUNT (Deprivation of Rights Secured by the First Amendment — Retaliation — P.A. 26-14, § 1 — Against All Defendants)**

1.–29. Paragraphs 1 through 29 of the First Count are hereby repeated and incorporated as Paragraphs 1 through 29 of the Third Count.

30. The plaintiff engaged in protected activity, including his March 21, 2025 federal action against the Secretary of Homeland Security and his other litigation, pursued openly and in his own name.

31. On March 21, 2025, the plaintiff petitioned a federal court to compel a decision on an asylum application the government had left undecided for nearly nine years — nine years in which it corresponded with him at his home address and never sought to detain him.

32. Thirteen days later, the agency did not decide his application; it closed it and issued the Notice to Appear, reviving a decade-old civil status charge it had known of since 2016 and never once acted on. Nothing about the merits changed in those thirteen days — the United States has since granted the same application. What changed was that he sued.

33. On May 5, 2025, ICE referred his case for enforcement, and on May 9, 2025, at his first appearance in the removal case his lawsuit had provoked, the defendants seized him with the violence described above — in the one place and at the one time his obedience to the law guaranteed he would be — and afterward described the immigration judge who questioned them as a “traitor,” hostility directed not at any threat but at the judicial process itself and at those who invoke it. The only times the government moved against the plaintiff in a decade were after he petitioned a federal court, and when he next appeared, as directed, before a judge.

34. The plaintiff's protected petitioning activity was a substantial and motivating factor in the timing and manner of the enforcement actions taken against him. Conduct of this kind — answering a lawsuit with an ambush at a courthouse — would chill a person of ordinary firmness from exercising rights secured by the First Amendment. Nor would the existence of arrest authority insulate the retaliation: nine years of non-enforcement against a known, cooperating, work-authorized applicant, followed by a violent courthouse seizure thirty-six days after he sued, is objective evidence that the plaintiff was treated differently from others similarly situated who had not petitioned the courts.

35. The defendants' conduct was willful, wanton, and malicious, or undertaken in reckless disregard of the plaintiff's rights, warranting punitive damages under Section 1(b) of the Act.

36. As a direct and proximate result, the plaintiff suffered the injuries described above, in violation of Section 1 of the Act and the First Amendment.

## CLAIMS FOR RELIEF

WHEREFORE, the plaintiff claims: money damages; punitive damages; reasonable attorney's fees and expenses; interest and costs; and such other legal and equitable relief as the Court deems just.

## JURY DEMAND

The plaintiff hereby claims a trial by jury.

Respectfully submitted,

THE PLAINTIFF, SAIFULLAH KHAN

By: /s/ Alexander T. Taubes
Alexander T. Taubes, Esq.
470 James Street, Suite 007
New Haven, Connecticut 06513
Tel. (203) 909-0048
alextt@gmail.com
Juris No. 437388